**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**FLOYD M. MINKS,**

        **Plaintiff,**

**-vs-**          **Case No. 6:05-cv-1894-Orl-31KRS**

**POLARIS INDUSTRIES, INC.,**

        **Defendant.**

## ORDER

This matter comes before the Court on the dueling motions for *Markman* claim construction filed by the Plaintiff, Floyd M. Minks ("Minks") (Doc. 67), and the Defendant, Polaris Industries, Inc. ("Polaris") (Doc. 42).

**I.  Background**

For many years, Minks performed outside engineering and design services for Polaris, which sells, among other things, all-terrain vehicles ("ATVs"). On May 12, 1987, Minks received U.S. Patent No. 4,664,080 (the "'080 Patent") for a "Selective Speed Limiting Apparatus for Internal Combustion Engine." (Doc. 1 at 5). The invention at issue is a governor, designed to limit the speed of motorized vehicles, such as the ATVs sold by Polaris, when they are operated in reverse. (Doc. 1 at 5). For some time Polaris bought speed-limiting products from Minks' company, but eventually switched to a competitor's version. (Doc. 52 at 5). Some time thereafter, Minks became convinced that the governor used by Polaris infringed the '080 Patent. (Doc. 52 at 5).

On December 22, 2005, Minks sued Polaris for infringement of the '080 Patent. (Doc. 1). In the instant suit, Minks has only alleged infringement of claim 2. (Doc. 67 at 5).

## II.     Standards

### A.     Claim Construction

Determining whether an accused process or device infringes a patent claim is a two-step process. The first step is claim construction, which involves ascertaining the scope and meaning of the claims at issue, while the second step involves determining whether the claims as construed read on the accused device. *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chemical Co.*, 204 F.3d 1360, 1363 (Fed. Cir. 2000). Interpretation and construction of patent law claims is a question of law to be resolved by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d, 967, 970-71 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). "In determining the proper construction of a claim, the court has numerous sources that it may properly utilize for guidance. These sources ... include both intrinsic evidence (*e.g.*, the patent specification and file history) and extrinsic evidence (*e.g.*, expert testimony)." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language and should be looked to first. *Id.* But the different forms of intrinsic evidence are not weighted equally.

> First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention. Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, so long as the special definition of the term is clearly stated in the patent specification or file history.
>
> Thus, second, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning.

> The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication. As we have repeatedly stated, claims must be read in view of the specification, of which they are a part. The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.
>
> Third, the court may also consider the prosecution history of the patent, if in evidence. This history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims. As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims.
>
> In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence. In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless.

*Id.* at 1582-83 (internal citations and quotations omitted).

### B.     **Means-Plus-Function**

Generally, limitations from the specification are not to be read into a patent's claims. *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). However, where the word "means" appears in a claim element in association with a function, it is presumed

to be a means-plus-function element to which 35 U.S.C. § 112, ¶ 6 applies.[1] *Al-Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999). That paragraph provides that

> [a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. Section 112, ¶ 6 was intended to permit use of means expressions without recitation of all the possible means that might be used in a claimed apparatus – but the price to be paid for that convenience is "limitation of the claim to the means specified in the written description and equivalents thereof." *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1208 (Fed. Cir. 2002). The duty to link or associate structure in the specification to the recited function is the quid pro quo for the convenience of employing § 112, ¶ 6. *Id.* at 1208-09.

Construing of means-plus-function limitations is a two-step process. First, the Court must identify the function of the means-plus-function limitation. *Texas Digital Systems* at 1208. Then the Court must identify the corresponding structure in the written description necessary to perform that function. *Id.* Structure disclosed in the specification is "corresponding" structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim. *Id.* (citing *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1429, 1424 (Fed. Cir. 1977).

**III.    Analysis**

For ease of reference, Claim 2 of the '080 Patent reads as follows:

---

[1] This presumption does not apply if the claim element also recites sufficient structure or material for performing that function. *Rodime PLC v. Seagate Technology*, 174 F.3d 1294, 1302 (Fed. Cir. 1999).

> A system for selectively inhibiting ignition above a preselected engine speed for an internal combustion engine, said system comprising:
> (a) means for providing an electrical input which varies in a predetermined manner with engine speed;
> (b) control means adapted to control the ignition of said engine, said control means including means for inhibiting ignition responsive to a control signal; and
> (c) means for providing said control signal responsive to a direct current voltage input to thereby selectively inhibit ignition responsive to the speed of said engine.

(Col. 5 at 52-65). Paragraphs (a), (b) and (c) employ the "means" language in connection with a function, raising the presumption that they are intended to invoke Section 112, ¶ 6. It does not appear, and Minks does not argue, that they recite sufficient structure or material for performing the functions that they describe. Thus, they are means-plus-function elements subject to Section 112, ¶ 6, and as to each paragraph, this Court must identify (1) the function of the means-plus-function limitation and (2) the corresponding structure in the written description necessary to perform that function. *Telegenix,* 308 F.3d at 1208 (Fed. Cir. 2002).

### A.     Paragraph (a)

As signaled by the preposition "for", the function of the means-plus-function element of paragraph (a) is "providing an electrical input which varies in a predetermined manner with engine speed." *See Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). Polaris contends that the '080 Patent discloses only a single circuit – Figure 2, which "shows a circuit diagram of an electronic speed limiter constructed in accordance with this invention" (Col. 2 at 45-47) – that could constitute the corresponding structure(s) necessary to perform the functions set forth in claim 2. (Doc. 42 at 7). (Figure 1 of the '080 Patent is simply a diagram "of a portion of a currently known vehicle wiring diagram." (Col 1 at 46-47). Therefore,

the argument continues, the means-plus-function limitations of claim 2 are limited to the structures set forth in Figure 2 (and their equivalents).  (Doc. 42 at 7).

According to Polaris, the corresponding structure responsible for performing the function recited in paragraph (a) is the electrical terminal labeled as terminal B in both Figure 1 and Figure 2.  (Doc. 42 at 9).  As Polaris describes it, terminal B consists of an electrical connection leading from an alternator's output terminal to a speed limiter circuit, and it provides the signal present on the alternator's output terminal to the speed limiter circuit as an electrical input, with the signal being indicative of an engine's speed – *i.e.*, the engine's RPM.  (Doc. 42 at 9).  Polaris therefore argues that this means-plus-function limitation should be construed as a structure that identically or equivalently comprises "terminal B shown in Figures 1 and 2, or more specifically, an electrical connection leading from an alternator's output terminal to a speed limiter circuit, the electrical connection providing the signal present on the alternator's output terminal to the speed limiter circuit as an electrical input, with the signal so provided being indicative of an engine's speed – *i.e.*, and engine's RPM."  (Doc. 42 at 11).

Minks argues that it should not be limited to the structure set forth in Figure 2 – or as Minks puts it, that it would be improper to import the limitations of the patent specification into claim 2.  In most cases, Minks would be correct.  *Comark Communications*,156 F.3d 1186.  But the elements at issue here are written in means-plus-function form, and are therefore subject to Section 112, ¶ 6.  They are therefore limited to the means specified in the written description (and equivalents thereof).  *Telegenix,* 308 F.3d at 1209.  Minks never addresses the means-plus-function language of the elements at issue or the implications of the use of means-plus-function language for claim construction.  Indeed, Minks never mentions Section 112, ¶ 6.

Instead, Minks quotes a number of passages from the '080 Patent that indicate that some other elements could conceivably be substituted for some of the items disclosed or mentioned in the specification, or that Minks intended his patent to cover the broadest scope possible. As an example, Minks points to a passage listing typical voltages for some of the parts of the circuit and stating that "[t]hese values are shown only to aid in the understanding of the invention and are no [sic] way to be considered as limitations since various adaptations can be made by those skilled in the art utilizing the teachings of this invention." (Col. 2 at 58-62). Such attempts to expand the scope of Minks' claimed invention are insufficient to overcome the requirements of Section 112, ¶ 6. Accordingly, the Court adopts Polaris' proposed construction, as detailed above.

### B.   Paragraph (b)

The parties are somewhat in agreement as to paragraph (b) of claim 2, which recites "control means adapted to control the ignition of said engine, said control means including means for inhibiting ignition responsive to a control signal". (Col. 5 at 58-60). A plain reading shows that the function of the control means is "to control the ignition of said engine, including inhibiting ignition responsive to a control signal". Minks points out that the specification describes the control means as comprising SCR1, adding that at Column 3, lines 47-51, he also wrote that "other semiconductor devices ... such as a triac" could be substituted. Minks contends that "there are numerous other electronic circuit devices, such as one or more transistors or even a digital circuit, that could substitute for the circuitry comprising SCR1." (Doc. 67 at 10). However, Minks does not cite any evidence supporting this contention, or make any argument as to why his expansive range should be preferred to what he specified as an acceptable substitution for SCR1: other semiconductor devices, such as a triac.

For its part, Polaris agrees that the specification discloses SCR1 as the structure corresponding to the control means set forth in paragraph (b), and that the specification also states that other comparable semiconductor devices could be substituted. (Doc. 42 at 13). Further, as shown in Figure 2, SCR1 is directly connected to the ignition stop wire at point C. Based on this, the Court adopts the construction proposed by Polaris for the limitation set forth in paragraph (b): a structure that identically performs the recited function of "inhibiting an engine's ignition in response to a control signal" and contains an SCR1 or other comparable semiconductor device as shown in Figure 2 and is connected to an ignition stop wire or its equivalent.

### C.     Paragraph (c)

Paragraph (c) recites means with a function of "providing said control signal responsive to a direct current voltage input to thereby selectively inhibit ignition responsive to the speed of said engine." After an exhaustive analysis (Doc. 42 at 15-22) of the pertinent portions of the specification, Polaris concludes that the structure corresponding to these means is the voltage-sensitive circuit disclosed in Figure 2. (Doc. 42 at 15). Polaris reaches this conclusion by, *inter alia*, pointing out that throughout the specification, Minks relies on sensing of voltage to accomplish this function. For example, at Col. 4 at 16-20, it is stated that "[t]hus the ignition is removed from the engine if the engine speed rises above the level where the alternator positive peak voltage at point B with respect to point A rises to turn on transistor Q1 and thus SCR1 as previously described." At Col. 2 at lines 2-4, a problem that makes "sensing of alternator voltage for speed measuring purposes more difficult" is discussed. No such discussion occurs with regard to alternator frequency, and no structure that accomplishes any function by relying on alternator

frequency rather than alternator voltage is disclosed or discussed anywhere in the specification.[2] As such, Polaris proposes the following interpretation: a structure that contains identical or equivalent structure to the voltage-sensitive circuit comprised of the following components as shown in Figure 2 and described in the specification: (a) diode D1, connected to terminal B; (b) voltage divider R1 and R2; (c) Zener diode Z1; (d) transistor Q1; (e) resistor R3; (f) diodes D1 and D2; (f) switch S3, connected to terminal A; (g) resistor R6; (h) capacitor C1; (I) voltage divider R4 and R5; and (j) an electrical connection from the voltage divider R4 and R5 over which a control signal is provided. (Doc. 42 at 22).

In response, Minks simply avers that the "direct current voltage input" recited in paragraph (c) is not the same as the "electrical input" recited in paragraph (a). (Doc. 67 at 11). Beyond this statement, Minks makes no real effort to identify a corresponding structure – i.e., to show how the specification or prosecution history clearly links or associates any structure to the function recited in paragraph (c). Instead, Minks simply states that the language of paragraph (c) is "clear and unambiguous to the skilled artisan" and that the function of paragraph (c) "is performed by all of the components in Figure 2, with the exception of Switch S3 and SCR1 and the associated inputs and outputs." (Doc. 67 at 11). The Court adopts the construction proposed by Polaris above.

---

[2] Polaris notes the two areas of the specification where the word "frequency" is utilized – at Col. 2 at 12-15, where it is stated that "[i]f the alternator is of the permanent magnet type both the frequency and the open circuit voltage of the alternator will change linearly with engine speed" and at Col. 5 at lines 21-25, which reads "[i]t should be noted that his control lead is neirhter [sic] the primary input voltage or [sic] frequency lead, point B, or the prmary [sic] ignition turn off lead, point C, both which [sic] are at relatively high and therefore dangerous levels of voltage." Neither of these references would be sufficient to teach one of skill in the art to make the invention with a circuit that senses alternator frequency rather than alternator voltage.

**IV.  Conclusion**

In consideration of the foregoing, it is hereby **ORDERED AND ADJUDGED**, that the Motions for *Markman* orders filed by the Plaintiff (Doc. 67) and by the Defendant (Doc. 42) are **GRANTED IN PART** and **DENIED IN PART**, as set forth above.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on December 13, 2006.

*[signature]*
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party