# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**FLOYD M. MINKS,**

                **Plaintiff,**

**-vs-**                                 **Case No. 6:05-cv-1894-Orl-31KRS**

**POLARIS INDUSTRIES, INC.,**

                **Defendant.**

_____

# ORDER

This case comes before the Court on the Motion for Remittitur (Doc. 288) filed by the

Defendant, Polaris Industries, Inc. ("Polaris"), and the response (Doc. 298) filed by the Plaintiff,

Floyd M. Minks ("Minks"). For the reasons discussed *infra*, Polaris's Motion will be denied.

## I. Background

Minks filed the instant suit on December 22, 2005, accusing Polaris of infringing his patent

for a speed limiting device for use on internal combustion engines. (Doc. 1). In January 2007,

after extensive discovery and motion practice, the case went to trial. On the fourth day of that

trial, the jury returned a verdict in favor of Minks, finding *inter alia* that Polaris had infringed his

patent, that Polaris had received notice of the infringement on Nov. 23, 2004, and that Minks was

entitled to $1,294,620.91 as a reasonable royalty for the use of his invention between the notice

date and October 28, 2005 – the date the patent ran out.[1] (Doc. 147). Finding that the amount of

_____

[1]Minks did not himself sell the patented technology. Instead, he had licensed his patents to
Minks Electronics, Inc. ("Minks Electronics") or Minks Engineering, Inc. ("Minks Engineering"),
which in turn manufactured and sold products, largely to Polaris.

the damages award was not supported by the evidence, the Court granted Polaris' motion to reduce damages or for remittitur (Doc. 171), reducing the damages award to $27,904.80. (Doc. 178). On appeal, the United States Court of Appeals for the Federal Circuit upheld the basis for the remittitur but held that Minks should have been given the option of a new trial on the issue of damages. (Doc. 200). The Federal Circuit also found that the Court's jury instruction as to the date of notice was erroneous. (Doc. 200 at 18). The case was remanded for a new trial.

Thus, the second trial in this case presented only two issues: (1) the date that Minks gave Polaris notice of its infringement and (2) the amount of Minks's damages in the form of a reasonable royalty accruing between that notice date and October 28, 2005. Prior to the second trial, the Court ordered Minks to disclose the damages theory or theories that he intended to present, along with the supporting evidence, and Minks did so on March 30, 2009. (Doc. 205).

On April 16, 2009, after another four days of trial, and after being given a modified charge patterned after the language of the Federal Circuit opinion, the jury returned a verdict in which it found the notice date to be January 27, 1997. (Doc. 262 at 1).[2] Based on a stipulation by the parties, the jury determined that Polaris had sold 581,565 ATVs with infringing speed limiters between the notice date and the date the patent ran out.

In resolving the issue of the reasonable royalty, the jury rejected a number of theories that Minks had advanced, such as an entire market value theory and a convoyed sales theory, which would have enlarged the base amount to which the royalty would apply. Instead, the jury opted for

---

[2]The only evidence in support of such a finding was Minks's (uncorroborated) testimony that he told Polaris executives at a meeting at their headquarters on that date that the company could not get around his patent.

a reasonable royalty based on a percentage of the sale price of the speed limiter itself. It was established at trial that the patented part had been sold by Minks Electronics to Polaris for $6.11. And there was some evidence – imprecise, inconsistent and almost entirely unsupported by documents, but still some evidence – that the royalty paid to Minks by Minks Electronics or Minks Engineering for the use of his inventions had varied over time, ranging from 20% of just the patented products sold by the company to 4% of all of the products sold by the company.

The jury made a special finding that Minks was entitled to receive a reasonable royalty of $1.22 for each of the 581,565 ATVs sold by Polaris with an infringing speed limiter during the pertinent time frame, explaining:

> We believe Floyd Minks would have negotiated 20% of the $6.11 cost per reverse speed limiter. That equals royalty of $1.22 per reverse speed limiter.

(Doc. 262 at 2).

In the instant motion, Polaris contends that the evidence was not sufficient to support a 20% royalty and that, at most, a 4% royalty was proven. Plaintiff, of course, disagrees, and points not only to Plaintiff's testimony, but to other evidence which, considered in light of *Georgia Pacific* factors, supports the jury's verdict.

## II. Legal Standards

### A. Patent Damages

The measure of recovery for patent infringement is governed by 35 U.S.C. § 284, which provides in pertinent part:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

The Supreme Court has defined "damages" in a patent case as "compensation for the pecuniary loss he (the patentee) has suffered from the infringement, without regard to the question whether the defendant has gained or lost by his unlawful acts." *Aro Mfg. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964). If actual damages cannot be ascertained, then a reasonable royalty must be determined. *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed.Cir. 1983). The royalty may be based upon an established royalty, if there is one, or if not, upon a hypothetical royalty resulting from arm's length negotiations between a willing licensor and a willing licensee. *Id.* Where an established royalty rate for the patented inventions is shown to exist, that rate will usually be adopted as the best measure of reasonable and entire compensation. *Id.*

In the case of *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), the court set forth the following list of factors that may be pertinent to the determination of a reasonable royalty in a patent case:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

> 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

The jury was provided with a similar list[3] and instructed that evidence of any of those factors could be considered in determining the value of a reasonable royalty. (Doc. 258 at 7-9).

B.    Remittitur

Rule 59(a)(1), Fed.R.Civ.P., provides that after a jury trial a court may order a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Although a federal court has no general authority to reduce the amount of a jury's verdict, a court that believes a jury's verdict is excessive may order a new trial unless the plaintiff agrees to remit a portion of the jury's award. *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320, 1328 (11th Cir. 1999).[4]

III.   **Analysis**

Because Minks did not sell the speed limiter himself, and thus did not personally suffer any lost sales as a result of the infringement, the proper measure of his damages was a reasonable royalty for the use of his invention by Polaris. The starting point for the determination of this

---

[3]Because no expert testimony was given, factor number 14 was omitted from the list provided in the jury instructions. Otherwise, the list was identical in substance to the list of factors in *Georgia-Pacific*.

[4]The Federal Circuit reviews issues not unique to patent law according to the law of the regional circuit where appeals from the district court would normally lie. *Tronzo v. Biomet, Inc.*, 236 1342, 1346 (Fed.Cir. 2001).

hypothetical royalty is the royalty or royalties actually paid to Minks by Minks Engineering or Minks Electronics for the use of the patented technology. The only documentary evidence produced at trial of any royalty agreement between Minks and either company was a document entitled "Written Consent to Corporate Action by the Board of Directors of Minks Engineering, Inc." and dated January 24, 1994. (Def. Exh. 7). This document reflected a "new royalty rate of 4%" to be paid to Minks "for revenues derived during calendar year 1993 " and ensuing years. However, Minks did not produce any documents that would confirm that either company ever paid him at such a rate or that he ever received such a royalty.

Minks testified that he received a royalty of 20% on patented products from Minks Electronics, and 6% and 10% royalty figures were also discussed at trial. But the evidence supporting these royalty figures was vague and imprecise. And none of these figures were confirmed by accounting records, tax records, or any other documents. It was revealed during the second trial that Minks' longtime accountant, Larry Herring, had detailed financial records concerning this matter,[5] but none were produced by Plaintiff, despite discovery requests to that effect by Polaris and an order to compel issued by the magistrate judge.[6]

_____

[5]These records included tax returns of both Plaintiff and Minks Engineering, and financial statements (monthly and annual) which would have shown the actual payments to Plaintiff and presumably the basis for same, *i.e.*, whether the transactions were intended as salary for executive services to the company or royalty payments for the patented technology.

[6]In April, 2006 Polaris served interrogatories and requests for production upon Minks seeking, among other things, the amount of damages sought by Minks and the basis for that damage analysis, as well as Minks' relationship with and compensation from Minks Electronics and Minks Engineering. (Doc. 33 at 11, 13-14, 20, 22-23). Minks declined to specify any such amounts or bases, saying only that he was seeking "a royalty rate determined by the *Georgia-Pacific* factors*"* (Doc. 33 at 14). Minks also refused to produce any Minks Engineering documents, stating that "Plaintiff does not own any stock of Minks Engineering and does not control the disposition of the business records of Minks

Defendant argues that this absence of documentary evidence renders the jury verdict speculative. But, the standard itself – a hypothetical royalty negotiation – is inherently speculative in nature. As the Federal Circuit has noted, the factual determination of a reasonable royalty "frequently is not supported by the specific figures advanced by either party." *Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F. 2d 1161, 1667 (Fed. Cir. 1991). Simply stated, the verdict must be based on *reasonable* speculation.

The jury had before it evidence of the relationship between Plaintiff and Minks Engineering, the relationship and dealings between Plaintiff and Polaris, and various royalty arrangements over time.[7] Even assuming that one of the lower royalty rates had stronger

_____

Engineering." (Doc. 33 at 21). (The evidence at trial showed that Minks controlled Minks Engineering at all times, no matter who held the stock, making this assertion hard to swallow – to put it mildly.)

When Polaris moved to compel, Minks failed to respond, and in July 2006 the magistrate judge overruled his objections, ordering him to reply to the previously objected-to interrogatories and to produce in conformity with the previously objected-to requests. (Doc. 39 at 2-3). On December 7, 2006, Polaris filed a motion for sanctions, contending that Minks had failed to comply with that order. (Doc. 89). With trial scheduled to being in January 2007, the magistrate judge denied the motion on the grounds that Polaris should not have waited until one month prior to the start of the trial to complain about alleged transgressions that had occurred months earlier. (Doc. 104).

At trial, the undersigned was told that Minks *had* complied with the July 2006 order of the magistrate judge by offering to allow counsel for Polaris to come rummage through stacks of boxes in Minks' warehouse to see if he could find any responsive documents. The Court strongly doubts that this satisfies Minks' obligation under either the Federal Rules of Civil Procedure or the order compelling discovery. Moreover, during the second trial, Minks' accountant was able to produce responsive financial documents with no difficulty – and no time spent rummaging through stacks of boxes in some warehouse.

[7]What the jury did *not* have was any of the existing documentary evidence that would have revealed the royalty payments Minks actually received for his invention. And the jury was not made aware of why this evidence – which anyone with even a passing familiarity with business recordkeeping would expect to see – was not introduced. While Plaintiff's withholding of relevant evidence might support a new trial, defendant has not moved for that relief. Instead, the Court will address this issue in connection with Polaris's Motion for Sanctions (Doc. 283) and Minks' Motion

evidentiary support than the 20% rate, the jury was not required to settle upon that lower figure.

Minks provided testimony on several issues – such as the exclusive nature of the license (allegedly) sought by Polaris, and the effect such exclusivity would have had on Minks Engineering – that the jury could have reasonably relied upon in concluding that the hypothetical negotiation would have resulted in a 20% royalty.

Accordingly, it is **ORDERED** that Defendant's Motion for Remittitur is **DENIED**. The Clerk is directed to enter judgment for plaintiff and against Defendant as follows:

| | |
|---|---|
| Enhanced damages ($709,509.30 x 2) | $1,419,018.60 |
| Prejudgment Interest ($709,509.30 @7.5% for 595[8] days) | 86,745.05 |
| Costs ($6,559.78 + 669.30) | 7,229.08 |
| Total | $1,512,992.73 |

The Court reserves jurisdiction to determine fees and sanctions, but will not rule on the outstanding motions for 30 days to give the parties an opportunity to resolve these issues amicably.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 17, 2009.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

_____

for Fees (Doc. 267).

[8]This 595 days covers the period from the expiration of the patent to June 15, 2007, when the first judgment was entered in this case. *See* Doc. 302.

Counsel of Record
Unrepresented Party